O'Connor *v.* City of Memphis.

JOHN O'CONNOR *v.* CITY OF MEMPHIS.

1. LEASE. *Express and implied covenants.* The covenant for quiet enjoyment of premises implied from the use of words of demise in a lease, will be modified or restrained by express covenants inconsistent therewith, and a covenant to aid the lessee in keeping possession of the premises is incompatible with the implied covenant.

2. SAME. *Consideration.* If the consideration agreed to be paid for a lease will for the unexpired time exceed any possible profit which the lessee could reasonably hope to derive from the limited use of the land permitted by the lease, there could be no recovery for a breach of the covenant of quiet enjoyment.

FROM SHELBY.

Appeal in error from the Circuit Court of Shelby county. C. W. HEISKELL, J.

COOPER, J., delivered the opinion of the court.

In the year 1866, the city of Memphis took into consideration the propriety of establishing a park out-

side of the corporation limits, and a proposition was made to it by John H. Speed and others, owners of a large body of land about four miles from the city, to donate 100 acres "for the purpose of a public park only," on condition that appropriations be made by the city at once "for fencing, laying out roads and walks, and embellishing the grounds in a way to be afterwards agreed upon." The proposition was accepted, and an appropriation of several thousand dollars made to enclose the land, or about ninety acres of it, with a fence, and it was enclosed accordingly. A plan for the improvement of the land was also agreed upon, but no appropriation was ever made by the city for embellishing it. The land consisted of a worn-out cotton field, cut up with gullies, and grown up in sedge-grass and brush. In this situation of things, on the 14th of April, 1868, the city of Memphis leased the enclosed ground to one J. H. McClure for the period of fifteen years, upon the condition and consideration that he would pay all taxes, assessments and public charges, keep the improvements, houses and fences in good repair, lay out the grounds in carriage ways and walks according to a plan made a part of the contract, and when said ways and walks cross streams or ravines to erect across them suitable bridges, the ways and walks to be at all times kept in good order and repair, and to be completed in detail before the end of the term. The lessee was also to plant, each year, 300 forest trees of different varieties on each side of the carriage ways, and to grass down from three to eight acres each year, and, at the end

of the term, deliver to the city the park, so grassed and planted, with the buildings and fences in good order and repair. The park was to be free to the public for drives and walks. The said McClure was authorized to use the grounds for profit as a nursery or garden when not inconsistent with the foregoing conditions, and to rent the same from day to day for picnic purposes, and keep and sell refreshments, preserving good order and decorum. It was further stipulated that the lessee was not to sub-let the premises to any one except by authority from the Board of Mayor and Aldermen of the city. The contract contained this further provision: "The city of Memphis agrees that it will aid the said McClure in keeping possession of said park, and will give all the assistance in keeping order in and around said grounds that they are able to do by authority of their charter and ordinances."

The lessee, McClure, had been the city engineer who drew the plan for the improvement of the land. Very soon after the lease was granted, he seems to have taken a third person into partnership with him, who afterwards sold out to John O'Connor. Early in the next year, the interest of McClure in the lease was levied upon by an execution against him issued by a justice of the peace, and, on March 25, 1869, was sold thereunder and bought by John O'Connor for $65. McClure acquiesced in the sale, and the city authorities seem to have recognized O'Connor as his successor. Subsequently, O'Connor's interest in the lease was also levied upon by execution against him,

and on October 20, 1870, sold to W. B. Goodlett for $825. On January 18, 1871, Goodlett, reciting a consideration of $1,000, conveyed the interest thus bought to Elizabeth M. O'Connor, the wife of John O'Connor, in trust for his children, who are the present complainants, by their father as next friend, the mother having died.

On March 7, 1873, Mary E. Speed and M. E. Deaderick, as her trustee, filed their bill against the city of Memphis and the O'Connors, claiming the land constituting the park as the property of Mary E. Speed, that neither she nor her trustee had ever conveyed the land to the city, nor given the city any authority to occupy it, and asking that the lease be set aside and they restored to the possession. The city seems to have undertaken the defense of the suit, and such proceedings were had that the complainants in that suit recovered the land, and were put into possession in 1874. This bill was therefore filed on June 17, 1874, setting forth the facts, and seeking to recover damages from the city of Memphis for the loss of the unexpired term upon an implied covenant for quiet enjoyment. The bill sets out in considerable detail the money expended in the erection of buildings on the leased grounds, in the making of ways and walks, planting of trees, putting the land in grass, etc.

The defendant demurred to the bill for want of equity, the breach complained of sounding in damages, and the bill involving no matter of account, or asking any discovery. The demurrer was overruled. But

O'Connor *v.* City of Memphis.

upon final hearing, after answer filed and proof taken, the chancellor dismissed the bill with costs for the want of equity.

Previous to the act of 1877, extending the jurisdiction of the chancery court, it is not easy to see how a court of equity could take cognizance of an action for the breach of a covenant for quiet enjoyment of leased premises, the recovery plainly sounding in damages. But it is not necessary to determine the point, for we are clearly of opinion that there is no covenant in this case to sustain the action, nor any damage shown if the covenant existed.

Since the days of Lord Coke, it has been considered settled law, that, although there may be both express and implied covenants in a lease, yet the covenants implied from the use of words of demise will be modified or restrained by express covenants: *Nokes Case,* 4 Co., 80. In that case an express covenant, that the lessee should enjoy the premises during the term without eviction by the lessor or any one claiming under him, was held to qualify the implied covenant for enjoyment against all persons. In the case before us, the express covenant is: "The city agrees that it will aid the said McClure in keeping possession of said park." The covenant would have no meaning or effect, unless it is held to qualify the implied covenant, and restrained it by the consent of both parties so that it should not extend further than the express covenant. The reason, moreover, for the limited covenant is obvious. The donation of the land to the city was a conditional one, dependent

upon its promptly executing the improvement of the premises in accordance with the plan prepared by the lessee himself. It is a reasonable presumption from the circumstances that the lessee assumed the burden, in consideration of the lease, of complying with the terms of the gift, and that the city intended to assume no covenant except the one expressed, to aid the lessee in keeping possession. This it did do by assuming the defense of the suit brought. There is an allegation in the bill that no real defense was made, and that the recovery was had by collusion with the city. But of this charge there is no proof, nor are the proper parties before the court for an attack on those proceedings. The action is on the implied covenant, and cannot be sustained unless the covenant exists, whether the recovery was fair or collusive.

The proof shows that less than a third of the land was laid off in walks and ways according to the plan, not a third of the trees planted, and very little if any of the land put in grass up to the time of the loss of the premises, and that what was done had been neglected. The evidence leaves no doubt that the expenditure for the remaining years of the lease, under the terms of that instrument, to put the land in the condition for delivery to the city in accordance with the stipulations, would far exceed any possible profit which the lessee could hope to derive from the limited use of the land permitted. The original lessee, McClure, after a year's experiment, was glad to get rid of his bargain at $65. And the testimony

is that the O'Connors had made a sub-lease before eviction, by which they surrendered possession of the premises to another for one-half of the net profits. There would have been no profits upon anything like an honest· compliance with the lease.

Affirm the judgment.